# C. H. ALBERS COMMISSION COMPANY, Appellant, v. SPENCER et al.

### Division One, June 29, 1907.

1. **SALES: Cornered Market: Avoidance of Contract.** Where plaintiffs, sellers of number two red winter wheat, were as much to blame for a corner in the wheat, as were defendants, buyers from plaintiffs, the courts will not set aside those sales and enjoin a bank or the exchange from paying to defendants the money put up to meet the margins.

2. ———: ———: ———: **Fixing Price.** The fact that one of defendants, a purchaser of wheat from plaintiffs for future delivery, testified that after he and his associates had cornered the wheat they could have named two dollars a bushel as the price, is not sufficient to establish a combination and conspiracy that will avoid the contracts of sale, but the question still remains whether or not the price they actually named (in this case ninety-two cents) was unreasonable and fictitious; and in determining that question other causes that might have influenced the price, such as shortness in the crop, rumors of war in wheat-growing countries, prices prevalent in other cities and prices of other kinds of wheat in the same city while the corner lasted, and prices of the same kind of wheat after the corner ended, are to be considered.

3. ——: ——: ——: ——: Rules of Exchange: Neglect to Invoke. Where sales for future delivery of grain were made on a board of trade or exchange and under contracts on which margins have been deposited, and were made with specific reference to the rules of the exchange, those rules are to be read into the contracts, and if they give the board of directors power, in case of a failure of seller and purchaser to adjust their respective claims, when called upon by either, to direct the payment of the deposit of margins, under such terms as they may prescribe, that power should be considered among the influences calculated to control the price; and a seller who had the right to invoke that power and neglected to use it, has no right to complain in a court of equity of unfair treatment.

4. ——: ——: Illegal Contracts: Federal Statute. The Federal statute denouncing certain sales of grain as illegal, has nothing to do with contracts made in Missouri to be performed in Missouri. And contracts for the purchase of grain made by residents of Missouri through Chicago agencies, to be delivered in Missouri, are also such contracts.

5. ——: ——: ——: State Statute: Secs. 8978 and 8981: Equity. Section 8978, Revised Statutes 1899, denouncing every pool, trust, agreement and combination to regulate, control or fix the price of any article therein referred to, or to limit the amount of any product or commodity to be produced, as illegal, and the two sections next following, making it the duty of the Attorney-General and the prosecuting attorneys to take certain action to prevent the violation of the statute, and to restrain those who would violate it, are intended for the correction and prevention of such unlawful acts, by proceedings in court in the name of the State; and section 8981 gives to a person injured by such unlawful act a remedy which is by a suit for damages wherein he may "recover three-fold the damages he has sustained," etc.; and if a defendant was guilty of violating section 8978, and plaintiff was injured thereby, plaintiff's remedy is a suit for damages under section 8981, and not otherwise. His remedy is not by a suit in equity. In aid of the suit at law, upon proper showing, as of insolvency or fraud, a court of equity might hold the marginal deposits, to prevent their dissipation while the suit was pending, but otherwise there is no equity jurisdiction.

6. ——: ——: ——: Sections 8965 and 8969. The unlawful conduct referred to in section 8965, Revised Statutes 1899, is likewise a matter between the State and the offending party; and the contract or agreement declared by section 8969 to be void is the contract or agreement to do what sections 8965 and 8966 forbid, but that contract is not an agreement made by a

seller of grain to sell purchasers so much wheat to be delivered in future. There is no law forbidding the purchase of grain to be delivered on a future date.

7. ——: ——: **Large Sales: Bulling Market: Future Delivery.** The law does not forbid the purchase of grain to be delivered in the future. Nor does it limit the quantity of a commodity one is permitted to buy, so long as he is guilty of no fraud or unlawful combination, even though his purchases aggregate an amount so large as to result in enabling him to bull the market.

8. ——: ——: **Equity.** The gravamen of plaintiff's complaint is that defendants combined to create a corner in wheat for December, the time the wheat sold by plaintiff to them in the summer and fall was to be delivered, and thereby forced the price to an unreasonable and fictitious figure. The evidence does not show that the price was fictitious or unreasonable, but if it had, it at the same time would have shown that plaintiff during the month of December sold very large quantities of the same kind of wheat at the same fictitious and unreasonable prices and reaped large gains from such sales. It also shows that plaintiff was as active in the market on one side as defendants were on the other, and that it was a battle between the bears and the bulls, in which the bulls were the victors. *Held*, that there is nothing in that kind of contest that especially appeals to the jurisdiction of a court of equity, and that plaintiff neither by its pleading nor by its evidence had made out a case that calls for the exercise of that jurisdiction.

9. ——: ——: ——: **Arbitration.** Where the parties to the contracts of sale of grain had, both by the rules of the exchange and the contracts themselves, made the board of directors of the exchange arbitrators of their differences, and there is nothing unreasonable or unlawful in the rules, and no charge is made of fraud or improper conduct on the part of the board, a court of equity will not exercise its extraordinary powers to prohibit the board from doing what the parties by their contract expressly authorized them to do.

10. **REMEDIES: Under Statute:. Equity.** Where a right is created by a statute and a remedy for its violation is given by the same statute, that remedy is exclusive, unless the statute says otherwise.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood*, Judge.

AFFIRMED.

*Barclay & Fauntleroy* for appellant.

(1) In determining whether or not a temporary injunction should be granted and maintained, pending litigation, plaintiff need only show ''probable cause'' for the injunction, together with evidence of serious injury and damage if the injunction were denied. ''Where the dissolution of an injunction would be practically a denial of the relief to which the complainant might show himself entitled on final hearing, the injunction should be continued.'' 16 Am. and Eng. Ency. Law (2 Ed.), 433; Sanitary Works v. Reduct. Co., 94 Fed. 696; Newton v. Levis, 79 Fed. 718; Railroad v. Railroad, 141 Fed. 901. (2) A conspiracy to fix the price of wheat, a necessary of life, and extort thereby a fictitious price therefor, by means of a ''corner,'' is unlawful, a violation of the State and Federal statutes (where the transaction involves interstate transactions) and precludes recovery on the contracts, whose solution depends on prices claimed or demanded by the manipulators of the ''corner.'' 26 U. S. Stat. at Large, p. 209; 3 U. S. Comp. Stat., p. 3200; R. S. 1899, secs. 8978, 8965; Samuel v. Oliver, 130 Ill. 73; People v. Exchange, 145 N. Y. 267; Railroad v. Collins, 40 Ga. 582; Hooker v. Vandewater, 4 Denio 349; Moore v. Bennett, 140 Ill. 69; 2 Beach, Modern Contracts, sec. 1582. (3) Sales of grain for future delivery (without intent not to deliver) are doubtless valid, even if the seller does not have the grain on hand at the time, but that sort of sale does not sanction or warrant a corner to create a fictitious price at delivery. Crawford v. Spencer, 92 Mo. 498; Kent v. Miltenberger, 13 Mo. App. 503; Mulford v. Caesar, 53 Mo. App. 263; Cockrell v. Thompson, 85 Mo. 510. (4) Persons injured by acts done in defiance of statutes against pools and conspiracies or other unlawful conduct may maintain injunction to prevent the execution of the purpose against which the unlawful and forbidden conduct is

directed. Crawford v. Spencer, 92 Mo. 498; St. Louis, etc., Co. v. Terre Haute, etc., Co., 145 U. S. 407; Woodson v. Barrett, 2 Hen. & M. 80; Lloyd v. Gurdon, 2 Swanst. *180; 15 Am. and Eng. Ency. Law (2 Ed.), 1005; Harding v. Glucose Co., 182 Ill. 551. (5) Equity has power to cancel written contracts based on violations of statute as well as to enjoin the enforcement of such contracts. U. S. v. Freight Assn., 166 U. S. 290; Johnson v. Cooper, 2 Yerger (Tenn.) 524; 15 Am. and Eng. Ency. Law (2 Ed.), 1002. (6) The obvious error of the learned and honored trial judge in dissolving the injunction in this case arose from his failure to give effect to the Missouri statute which permits a purchaser from an unlawful combination to resist the enforcement of contracts made in defiance of law, as distinctly declared by the statute. Such contracts of purchase and (for stronger reason) of sale are void and not enforceable by either party, buyer or seller, if tainted by illegality of monopoly. R. S. 1899, secs. 8966, 8970; Diamond Glue Co. v. Glue Co., 187 U. S. 611; Heim Brewing Co. v. Belinder, 97 Mo. App. 64; Ehrhardt v. Robinson, 78 Mo. App. 404; Nat. Lead Co. v. Paint Co., 80 Mo. App. 247; Heileman v. Peimeisl, 85 Minn. 121; Finck v. Granite Co., 187 Mo. 244; Tri-State Co. v. Amusement Co., 192 Mo. 404; U. S. Rubber Co. v. Shoe Co., 132 Fed. 398.

*Judson & Green* for respondents.

(1) (a) The circuit court had no jurisdiction to entertain the application for injunction, and it was improvidently issued in the first instance, as appellant was bound to appeal to the jurisdiction of the Exchange which he had already invoked in the matter of the certificates of deposit for the security of the contracts. Pacaud v. Waite, 218 Ill. 136. (b) The rules of the Exchange expressly provided against fictitious and manipulated prices, so that there was no reason dis-

closed why appellants should not-have had a full and fair hearing as to their contention in the tribunals expressly selected by themselves. (2)  (a)  The petition discloses a plain and adequate remedy at law by action for damages. Under their own allegations, the amount of liability was fixed by the rules. There was nothing left in the controversy but damages on an admittedly defaulted contract. Humphreys v. Atlantic Milling Co., 98 Mo. 552; Benton County v. Morgan, 163 Mo. 661; Bank v. Packing Co., 138 Mo. 59. (b) There is no allegation of insolvency on the part of Spencer and Milliken or any of their brokers. Arbogast v. Bank, 125 Fed. 518. (3) There is no equity in the petition upon its face, in that there is no tender of the wheat which appellants agreed to deliver by their contracts. The alleged "corner" only related to the month of December. There is no allegation of a tender since that time, nor any reason why the wheat has not been tendered since that time. (4) There is no equity in appellant's petition in that upon its own showing it was a speculator in the market, contracting to sell and deliver what it did not own, admittedly taking the benefit of the prices which it now alleges were fictitious, violating the rules of law and of public policy in its control over public elevators in Illinois in such speculations, and asking the court to be relieved of the consequences of such speculations. Center Elevator Co. v. People, ex rel., 174 Ill. 203; Hannah v. People, 198 Ill. 77; Illinois Railroad & Warehouse Law of 1871. (5)  (a) Even assuming that the court below had jurisdiction and that there was a case of equitable cognizance presented by the petition, there is nothing for this court to review, in that the finding of the court below and the dissolution of the injunction was based upon a determination from the evidence that the price on December 31 was not fictitious but the reasonable market price. Not only is this conclusion warranted by the

evidence, but no other conclusion could have been made upon the evidence.    (b)    Irrespective of all other points, there was a complete failure of proof on the essential averment of a fictitious price of December wheat on December 31, 1903.   A price influenced by speculative conditions for which the speculative seller is equally responsible with the speculative buyer, is not necessarily a fictitious price, and in the case at bar there is no evidence whatever of a fictitious price. Kent v. Miltenberger, 15 Mo. App. 480.   The effect of the purchases on the price was incidental only.   U. S. v. Knight Co., 156 U. S. 1.

VALLIANT, P. J.—This is a suit in equity. There were five suits of the same nature and in reality between the same parties, but the real defendants having acted in the transactions involved by different agents or brokers those were also made parties defendants and for that reason separate suits seemed advisable. The only defendants having any real financial interest in the suits are the executors of the will of Corwin H. Spencer (one of the original defendants who has died since the appeals were taken) and John T. Milliken, and therefore for brevity they will hereinafter be called the defendants; the St. Louis Merchants Exchange and the individuals composing its board of directors, and the National Bank of Commerce are also parties defendants, but when it becomes necessary in this opinion to mention either of them the mention will be by name.   When the five suits came on for hearing they were by agreement of the parties  consolidated  and tried as one.

The plaintiff and the defendants at the time of the transactions involved were members of the St. Louis Merchants Exchange and the transactions were conducted on the floor of the Exchange and subject to its rules.   The controversy grows out of sales by the plain-

tiff to the defendants, during the fall of 1903, of No. 2 red winter wheat to be delivered on any day, at the option of the plaintiff, during the month of December, 1903. The plaintiff, under the rules of the Exchange, to secure the performance of its contracts deposited in the National Bank of Commerce certain sums of money to cover what is called in the language of the Exchange "margins." All during the month of December the market price of No. 2 red winter wheat was higher than the price at which the plaintiff had sold it to defendants and the plaintiff failed to deliver it according to contract, therefore according to the strict terms of the contract the defendants were entitled to receive from the bank the moneys deposited as margins. But by the terms of the certificate of deposit the money was payable to defendants only on the indorsement of both parties to the contract, the seller and the buyer, or under order of the board of directors of the Exchange.

The plaintiff refused to endorse the certificate of deposit and, apprehending that the board of directors of the Exchange would make the order, filed these suits in equity, alleging that the defendants had entered into an unlawful combination or conspiracy whereby they had cornered the No. 2 red wheat market and forced it up to an unreasonable and fictitious price, in violation of the statute law of the United States and that of the State of Missouri, and praying that the plaintiff's contracts be cancelled, that the board of directors be enjoined from ordering the moneys deposited for margins to be paid to defendants, and enjoining the bank from paying the same. On filing the bills temporary injunctions issued as prayed, after which answers were filed and the causes came on for hearing on motions to dissolve the injunctions. On a very elaborate hearing apparently of all the points in dispute, during which evidence was introduced that cov-

ers over 700 printed pages of the record in this court, the trial court sustained the motions and dissolved the injunctions, but did not dismiss the bills for the reason as stated in the order dissolving the injunctions that other than injunctive relief was sought. From the order dissolving the temporary injunctions the plaintiff appealed and plaintiff also moved the trial court to continue the injunctions in force pending the appeal which the court refused and plaintiff excepted.

The main proposition on which the plaintiff relied at the trial was that the defendants had by combination and conspiracy cornered the market and forced the price of the wheat up to an unreasonable and fictitious figure.

The sales in question were made by the plaintiff at various dates running through September, October and November, 1903, at prices ranging from 80 to 84 cents, and they aggregated more than 300,000 bushels. The prices of the wheat during December ranged from 90 to 93 cents and closed on the 31st of that month at 92 cents, so that there was a wide margin on the contracts in favor of defendants.

The trial judge made a very careful review and summary of all the evidence in the case, a copy of which is in the record, in which he says that there can be no doubt but there was a corner in No. 2 red winter wheat, but he does not lay the blame therefor to the buyer any more than to the seller, it was influenced as well by those who thought the price was too high and would decline (of whom was plaintiff) and therefore speculated by selling short, as by those who thought it would advance (of whom were the defendants) and speculated by buying long. Both parties were buying or selling as in their respective judgments the market would go up or go down; there was nothing more praiseworthy or blameworthy in the conduct of one

205 Sup—8

than of the other. There is no more merit in depressing the market to the disadvantage of the farmer who has wheat to sell than there is in advancing it to the disadvantage of the miller who comes to buy. There is nothing in the evidence to indicate that either the plaintiff or the defendants were in the market for any other purpose than their own gain and there is no suggestion of fraud attached to either.

We have said that the trial court, though finding that a corner existed, did not attribute its existence to the buyers more than to the sellers, and we think the court was right in that conclusion. The first tendency of selling short is of course to depress the market but after sales for future delivery in great quantities have been made and crop conditions and market conditions indicate that there will be a considerable rise in the market price those large outstanding contracts of sales for future delivery signify to those who have the commodity for sale that there must come a demand in the market to meet those contracts, and they stiffen in their demands, then the efforts on the part of those who have sold short to buy against the day of the maturity of their contracts excite the market, and when that condition comes if those who have previously been purchasers have purchased to such an extent that there is not enough of the commodity outside of their purchases to supply the demand of those who are forced to make purchases to fill their former contracts the result is a corner and the early purchasers are, to some extent at least, masters of the situation. That is what occurred in this case. Selling short in great quantities for December deliveries created a demand for December wheat with which to fulfill those contracts and if the supply was not sufficient an inflamed market was the natural result. But when buyer and seller are dealing with each other on terms of equality the one is no more responsible for the result than the other.

The evidence shows that No. 2 red winter wheat is a special feature of the St. Louis market, it is sold elsewhere, but St. Louis is the main market for it; the evidence also shows that the crop of No. 2 red winter wheat of 1903 was very short, not much more than one-half what it was in 1902, and there were other disturbing influences that tended to enhance the price of this commodity in this market. The defendants did not acquire by their purchases all the crop of No. 2 red winter wheat but in realty only a small part of it, the total crop grown in Missouri, Illinois and Indiana in 1903 was 62,760,000 bushels while the total purchases of the defendants amounted to only 7,500,000. But the advantage that the defendants acquired arose, as plaintiff alleges, from the fact that by their contracts, which were made to be performed under the rules of the St. Louis Merchants Exchange, the deliveries of the grain were to be made in the elevators within the jurisdiction of that Exchange and the defendants' purchases were sufficient in quantity to cover the capacity of those elevators, and that being so, it is contended that the defendants could dictate to the plaintiff the price of the wheat it was bound to deliver under its contracts. The defendant Spencer testified that having purchased all the wheat of that quality wanted in the St. Louis market they could have named the price to suit themselves, they could have named it at $2 a bushel, but did name it at 92 cents because they did not want to establish what might be regarded as a fictitious price. Under that condition of the market if there had been no other power to influence the price doubtless it was at the will of the defendants, but in fact there was another power to influence and control it as will be noticed hereinafter.

The judgment of the trial court however did not turn on the question of corner or no corner; the question was, was the price unreasonable or fictitious? The

court found that it was not. We have gone over the testimony and are satisfied that the finding of the chancellor on that question was correct.

There would be no profit in summarizing the evidence in this opinion, the unusually short crop alone might reasonably account for an unusually high price, but there were other causes, among which were rumors of war between Russia and Japan. The prices prevalent in St. Louis during the month of December and on the last day of that month were not out of proportion to the price of the same article in other markets and not out of the normal ratio of the price of wheat of other grades. Besides the prices of No. 2 red winter wheat in the St. Louis market ranged as high or higher after the 31st day of December, 1903, which was the end of the corner, as they did during that month.

We have above said that besides the manipulations of the parties there was another power to influence or control the prices at which settlements could be required under contracts like these, or, more strictly speaking, at which the marginal deposits could be regulated. That power was in the board of directors of the Merchants Exchange; these parties had agreed to submit to it, the plaintiff had the right to invoke it and the defendants were bound to obey it. In the preamble to the rules of the Exchange, after reciting the general purpose of the institution, it is said: "and with a view to avoid and adjust, as far as practicable, the controversies and misunderstandings which may arise between individuals engaged in trade when they have no acknowledged rules to guide them, do hereby agree to be governed by the following rules, regulations and by-laws."

Then follow rules very explicit in their terms, among which are provisions governing transactions of the kind now in question, prescribing how deposits shall be made to cover margins, the form of certificates of deposit, how, when and by what authority they are

to be paid, how prices are to be fixed on which the margins are to be calculated, etc.

Section 7 of Rule VII provides that: "The Board of Directors, upon the application of a party in interest, shall fix the value of any commodity for marginal purposes only, and in determining the value of the property under this rule, its value in other markets, or for manufacturing or consumptive purposes in this market, together with such other facts as may justly enter into the determination of its value, shall be considered, irrespective of any fictitious price it may at the time be selling for in this market."

Section 6 of the same rule is as follows: "In case of a failure between the contracting parties to settle and adjust their respective claims under a contract on which margins have been deposited, and either party refuses to endorse the certificate of deposit, the party claiming such deposit may apply to the board of directors, who shall have the power to direct the payment of the deposit, or such portion of it as may appear to be due to either or both parties, under the rules of the Exchange, under such terms as the directors may prescribe; provided, however, that no surrender of the deposit shall be ordered by the board pending any arbitration or reference touching the rights of the parties under the said contract, or in case the party refusing to adjust the dispute shall signify his willingness to submit the matter to the Committee of Arbitration, or the Committee on Contracts for Future Delivery."

The contracts in question were made with specific reference to those rules and the rules are to be read into the contracts. There was evidence tending to show that the plaintiff with others in like condition invoked the power of the board of directors under those rules to fix the price of December wheat and that the board did so. Perhaps strictly speaking it is not correct to say that this plaintiff was one of those who invoked

that action because its corporate name did not appear in the proceeding before the board, but another corporation represented by its president, Mr. Albers, who was also at the same time president of the plaintiff corporation, was one of them, and at the hearing before the board Mr. Flesh, who was at the time the vice-president of the plaintiff, took an active part. But for the purpose of this case it is not very important that it should be shown that the plaintiff in its own right was a party to that proceeding; it is sufficient that it had a right under its contracts to invoke that authority and it has no right to complain in a court of equity of unfair treatment when it has neglected to take the measures provided for its protection.

It is contended in behalf of the plaintiff that the conduct on the part of the defendants in creating a corner in the market for No. 2 red winter wheat was an illegal act denounced by the act of Congress (26 U. S. Stat. at Large, p. 209) as well as by the statute of Missouri (sec. 8978, R. S. 1899). Since the contracts we are dealing with now were made in Missouri to be performed in Missouri the Federal statute has nothing to do with them, and this is so although the evidence shows that defendants made some other purchases through Chicago agencies for No. 2 red winter wheat to be delivered in St. Louis during December 1903, still those also were contracts made in Missouri to be performed here.

Section 8978, Revised Statutes 1899, denounces every pool, trust, agreement, combination, etc., to regulate, control or fix the price of any article therein referred to, or to limit the amount of any product or commodity to be produced, as illegal. The two sections next following make it the duty of the Attorney-General and the prosecuting attorneys to take certain action to prevent the violation of the statute and restrain those who would violate it. Those sections are intend-

ed for the correction and prevention of such unlawful acts by proceedings in court in the name of the State. The section next following, 8981, gives to a person injured by such unlawful act a remedy which is by suit for damages wherein he may "recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

If the defendants were guilty of violating section 8978 as plaintiff contends they were, and if the plaintiff was damaged thereby, its remedy is under section 8981 and not otherwise. In aid of a suit at law under that section if a proper showing were made, as of insolvency of the parties or fraud, or the like, a court of equity might hold the marginal deposits to prevent their dissipation while the suit was pending, but otherwise there is no equity jurisdiction. Where a right is created by statute and a remedy for its violation is given by the same statute, that remedy is exclusive unless the statute says otherwise.

Plaintiff also refers to section 8965, Revised Statutes 1899, which also denounces certain combinations to fix prices, etc., as unlawful and prescribes penalties for violation. The unlawful conduct referred to in that section is also a matter between the State and the offending party.

The contract or agreement declared by section 8969 to be void is a contract or agreement to do what sections 8965 and 8966 forbid, but such contract is not the contract which this plaintiff made with these defendants to sell them so much wheat to be delivered in December, 1903.

Section 8970 provides that a purchaser of any article from a person or concern doing business in this State in violation of the above-mentioned sections, should not be liable to pay for the same, but the plaintiff is not a purchaser under such circumstances. The

plaintiff's case is not within any statute to which we have been referred.

The evidence does not show that these defendants have done any of the acts forbidden in the statutes above referred to. It shows that during the summer and fall of 1903 they bought from various parties wheat to be delivered to them in December; there is no law forbidding such purchases. It also shows that their purchases aggregated an amount so large as to result in enabling them to bull the market, but the law does not limit the quantity of a commodity one may contract to buy as long as he is guilty of no fraud or unlawful combination. The only combination the evidence in this case indicates that these two defendants entered into was to buy for their joint account. It was shown that many of their purchases were made by brokers for them without using their names, but plaintiff does not contend that that was unlawful or fraudulent; in fact, the evidence shows that the plaintiff itself was a large operator in transactions of that character.

The plaintiff neither by its pleading nor its evidence has made out a case calling for the exercise of the jurisdiction of a court of equity. The gravamen of its complaint is that the defendants combined to create a corner in December wheat and thereby forced the price to an unreasonable and fictitious figure. The evidence does not sustain the charge. But if the evidence had shown that the price was unreasonable or fictitious, it would have shown at the same time that the plaintiff during the month of December sold very large quantities of No. 2 red winter wheat at the alleged unreasonable and fictitious prices then prevailing and reaped large gains from such sales.

The evidence shows that the plaintiff was as active in the market on one side as the defendants were on the other, it was only a battle between the bears and the bulls in which the latter seem to have been the vic-

tors; there is nothing in that kind of contest that especially appeals to the jurisdiction of a court of equity. In such case, if contracts have been violated or wrong has been done the party complaining must show something more than a mere violation of his legal rights to entitle him to relief in equity. We are referred to Crawford v. Spencer, 92 Mo. 498, as authority holding that persons injured by acts done in violation of the statutes against pools and conspiracies may have relief in equity regardless of any other fact calling for equity jurisdiction. We do not so understand that case. The equity jurisdiction there invoked was to enjoin the foreclosure of a deed of trust given to secure a note the consideration of which arose out of an alleged unlawful future deal in grain. The consequence of the sale of land under a deed of trust in conformity to the terms and exigencies of the deed is quite different from the consequence of the payment of a sum of money by a solvent bank to a person whom the plaintiff alleges is not entitled to it.

The bank that held these deposits was responsible to the plaintiff if it should pay them out contrary to the express terms of the contract and there is no suggestion that the bank was insolvent. Under the rules of the Exchange and the terms of the certificates of deposit, if the parties to the transaction, the buyer and the seller, could not agree to jointly endorse the certificate for payment, the board of directors of the Exchange were authorized under certain conditions to order such payment. That authority the parties to these contracts had expressly conferred on the board of directors, not only when they became members of the Exchange, but in each of the contracts itself was this express clause: "This contract is subject in all respects to the rules and regulations of the Merchants Exchange of St. Louis." Yet the plaintiff without any allegation of fraud or improper conduct of any kind on

the part of the board of directors asks a court of equity to exercise its extraordinary power to enjoin the board from doing what the contracts signed by the plaintiff expressly declared they should do. There is nothing unreasonable or unlawful in the rule giving that power to the board of directors of the Exchange; indeed its wisdom and justness is apparent on its face. We have often held clauses in contracts for large public works agreeing to submit certain matters to an arbitrator therein named, to be valid, and the Supreme Court of Illinois has held valid a rule of the Chicago Board of Trade similar to this rule. [Pacaud v. Waite, 218 Ill. 138.]

The only error the trial court committed was in issuing the temporary injunctions in the first place, but that error it has itself corrected. The judgment is affirmed.

All concur.