## PETO v. HOWELL.

### No. 6625.

Circuit Court of Appeals, Seventh Circuit.
Dec. 14, 1938.

Rehearing Denied Feb. 13, 1939.

354

Meyer M. Rich and Murray Schwartz, both of Kansas City, Mo., and M. Lester Reinwald and Morris Sostrin, both of Chicago, Ill., for appellant.

Amos C. Miller, Edward R. Adams, Sidney S. Gorham, Jr., Robert W. Wales, and William Simon, all of Chicago, Ill., for appellee.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff sued to recover damages alleged to have been caused by a monopoly by defendant in violation of Section 2, Chapter 1, Title 15, U.S.C.A., which provides that "every person who shall monopolize, or attempt to monopolize, * * * any part of the trade or commerce among the several States * * * shall be deemed guilty" of a violation of the law, suing under Title 15, Chapter 1, Section 15, U.S.C.A., providing that any person injured in his business or property by reason of any violation of the Anti-Trust Laws may sue and recover three-fold the damages by him sustained. Plaintiff is a dealer in grain living in Kansas City, and defendant a grain trader and member of the Chicago Board of Trade.

Plaintiff, in his second amended complaint, charged that corn is a staple commodity, grown principally in western United States, shipped largely to eastern states in interstate commerce, moving from west to east, from one state to another, on through railroad rates, under tariffs permitting grain to be stored temporarily in Chicago; that the Board of Trade conducts a public market for the purchase and sale

of grains for present and future delivery; that grain, to be deliverable on future contracts, must be in public warehouses in the Chicago district designated as "regular"; that Chicago is the principal corn market of the United States and that the price of corn throughout the country is based upon the prices quoted there.

It was further alleged that defendant, for the purpose of monopolizing trade in Chicago and throughout the United States, in violation of the federal statutes, on April 24, 1931, began to purchase on the Board, large amounts of "July corn," that is, corn to be delivered in Chicago during the month of July; that by May 25, 1931, defendant had purchased approximately 3,250,000 bushels of July corn; that thereafter in the middle of May, he purchased 4,250,000 additional bushels and held on June 1, 1931, approximately 7,500,000 bushels; that he made additional purchases until, on July 1, 1931, he owned future contracts for delivery of July corn in the amount of 8,500,000 bushels; that this amount exceeded the supply of corn available for delivery in Chicago in July; that the purchases were made with the intention on the part of defendant of withholding the commodity from the market and thereby causing a sharp increase in its price; that he withheld the corn from the market and that his action in so doing caused a rapid rise in the price; that delivery of corn to persons holding contracts for the purchase thereof was customarily made by delivery of warehouse receipts; that defendant had received on July 30, 1931, in performance of his contracts of purchase, warehouse receipts covering all of the deliverable July corn in storage in the Chicago district; that there were in storage in Chicago 5,650,000 bushels of deliverable corn; that this had all been delivered to defendant; that he had received in addition some 1,500,000 bushels which he had thereafter sold and delivered outside of the United States; that the total corn delivered to defendant by the socalled shorts to apply on his contracts amounted to approximately 7,000,000 bushels, so that on July 30, 1931, defendant still owned contracts for delivery of 1,500,000 bushels of July corn; that there was then no corn in Chicago of deliverable grades that could be delivered; that those who had contracted to deliver corn could not procure it; that thereby defendant cornered the market, became the dictator of the price in Chicago corn and exacted of those unable to deliver, in settlement, an excessive sum of money; that plaintiff was amongst those and thereby was forced to pay in settlement a large amount of money; that the action of defendant as related constituted a monopoly of the corn market of Chicago and of the United States, amounted to direct obstruction to interstate commerce in said commodity, unreasonably restrained interstate commerce therein, and artificially caused an increase in the price, all contrary to the acts of Congress.

Plaintiff relied upon the Grain Futures Act, Title 7, Chapter 1, Section 5, U.S.C.A., as follows:

"Transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that such transactions are carried on in large volume by the public generally * * *; that the transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling grain and products and by-products thereof in interstate commerce, and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof and render regulation imperative for the protection of such commerce and the national public interest therein. ([United States Code, Title 7, Chapter 1, Section 5]; Sept. 21, 1922, c. 369, § 3, 42 Stat. 999.)"

"§ 3. *When transaction deemed in interstate commerce;* * * *. For the purposes of this chapter (but not in any wise limiting the definition of interstate commerce in the preceding section) a transaction in respect to any article shall be considered to be in interstate commerce if such article is part of that current of commerce usual in the grain trade whereby grain and grain products and by-products thereof are sent from one State with the expectation that they will end their transit, after purchase, in another * * * (Sept. 21, 1922, c. 369, § 2, 42 Stat. 998.)"; held constitutional in Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839.

Plaintiff's evidence tended to substantiate all of the averments of the bill. It appeared clearly that the defendant began to

enter into July future contracts in April, 1931; that such futures were selling then at the lowest price in eight years; that the price continued to fall; that defendant added to his holdings; that at the end of May, the price had declined to 54¼ cents and that he had, as alleged, acquired contracts for approximately 8,358,000 bushels of July corn; that this constituted approximately 90 per cent. of the "total commercial visible supply of corn" in the United States; that during the last three days in July there was no more corn in Chicago to be delivered; that those who had contracted to deliver to him were unable to procure corn in Chicago or elsewhere because of lack of time; that the fluctuations in price in the last three days were unusual and of much wider range than under normal conditions; that the price was such that corn in Iowa normally destined for other places moved to Chicago; that the price was artificially raised about 25½ cents per bushel; that on August 1, following the expiration of the delivery month, corn fell in price some 10 per cent and before the end of August had depreciated some 40 per cent.

Defendant admits that liquidation of his holdings at any time prior to the expiration of July by an attempt to sell his future contracts would have caused a wide break in the market price "with serious effect upon the defendant and the country." He further says that the ordinary method of disposing of such contracts was to accept delivery and that some of the shorts never made delivery and settled with him as alleged by plaintiff.

The purchases of defendant were made through some sixteen different accounts with eight different grain brokerage houses. He purchased corn not only in his own name but in the names of other persons, in these sixteen accounts. He shipped to Canada about 900,000 bushels of corn, delivered to him under these contracts, before the expiration of July. He made a substantial profit upon all of his contracts. He also purchased cash corn in July of 322,000 bushels, which are included in the total of 8,358,198 bushels. He had left at the end of July, 7,440,975 bushels. The commercial visible supply of corn on August 1, 1931, was 8,123,000 bushels, and of this amount 7,673,000 bushels were in Chicago. In other words, defendant had at that time 97 per cent of the total of deliverable corn in Chicago, and that in Chicago was 94 per cent of the entire amount in the United States; hence defendant held 90 per cent of the entire national commercial visible supply.

The court held the evidence insufficient to support a verdict for plaintiff and directed a verdict for defendant. Plaintiff now insists that there was substantial evidence of monopoly and of an attempt to monopolize a part of interstate commerce, forbidden by Section (2) of the Act. Defendant insists that all of the deliveries to him were intrastate in character; that he purchased in Chicago, contracts for the delivery of corn in Chicago; that he did not monopolize or attempt to monopolize any part of interstate commerce and that plaintiff is without right to recover because he was engaged in a gambling transaction.

Stated succinctly, plaintiff's case is this: "I have been injured in my business by reason of defendant's violation of the Anti-Trust law in that he monopolized or attempted to monopolize that part of trade or commerce among the several states which consists of the commercial visible supply of corn in the Chicago market of July, 1931," applicable to contracts for delivery in that month. The statute forbids monopolies of "any part" of interstate commerce. "Any part" of commerce may cover commerce in a vast district, or that in a small district, that occurring over a long period of time or over a short period of time, but it is not to be conceived that a monopoly of all that part of interstate commerce in the city of Chicago for one day is any less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year. It is the act of monopoly over a product in any part of interstate commerce that is forbidden. It seems apparent here that plaintiff proved that defendant had 'a monopoly over and controlled by a corner all of the future contracts for corn to be delivered. —capable of being delivered in the Chicago market in the month of July; that in addition, he purchased in the cash market, available corn in the Chicago market amounting to over 300,000 bushels, and that at the end of the month, he controlled all but 3 per cent. of the available commercial supply of corn for the Chicago market. Consequently when the end of the month arrived, some of the persons who had agreed to deliver to him corn found no available supply from which they could procure the commodity to deliver to him, for the simple reason that defendant then had

a monopoly of the visible commercial supply of corn in the Chicago market, which constituted 90 per cent. of such supply in the entire country.

If this suit were brought under the state statute forbidding such transactions, it might well end with these statements; but the essential and crucial question involved here is whether the court had jurisdiction of the cause by virtue of the federal statute and that in turn resolves itself into a question of whether the facts recited constitute not only a monopoly of corn in the Chicago market as stated but also the monopoly of "some part" of interstate commerce. That question is the battle-front of the respective parties and upon its decision must rest the final determination of the correctness of the District Court's action.

In Hill v. Wallace, 259 U.S. 44, 42 S. Ct. 453, 66 L.Ed. 822, the Supreme Court held the Future Trading Act then in existence unconstitutional, on the ground that future delivery contracts involve purely intrastate matters. The court suggested that sales for future delivery cannot come within the regulatory power of Congress as such until Congress finds from the evidence before it that they interfere directly with interstate commerce so as to be an obstruction to or a burden thereon. Congress heeded the instruction of the court contained in this remark and in the Grain Futures Act, 7 U.S.C.A. §§ 1–17, controlling in this action and hereinbefore set forth, found as a fact that contracts for future delivery are affected with a national public interest; that as a result, speculation, manipulation and control, coincidental with sudden or unreasonable fluctuations in prices frequently work detrimentally to the producer, consumer and dealers in the products and by-products in interstate commerce. It expressly found that such fluctuations and speculations are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof, and necessitate regulation for the protection of such commerce. Having found this situation to exist, Congress provided that a transaction in respect to any article shall be considered to be interstate commerce, if such article is part of that current of commerce usual in the grain trade whereby grain and its products and by-products are sent from one state with the expectation that they will end their transit, after purchase, in another, and proceeded to establish rules for the regulation of Boards of Trade and trading on such Boards. Congress did not in so many words say that the subject matter of future contracts is a part of interstate commerce. It did say that they and their practical results are an obstruction to and interference with interstate commerce and the current thereof from state to state, which renders regulation necessary.

An attack upon the constitutionality of this Act failed in Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. Mr. Chief Justice Taft pointed out that Congress had in this legislation found that by manipulation such contracts had become a constantly recurring burden upon and obstruction to interstate commerce. He remarked that it was impossible to distinguish cash grain, the sales to arrive and the grain actually delivered in fulfillment of future contracts from the current of stock shipments, declared to be interstate commerce in Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. He said that this was the necessary consequence of the conclusions reached in Swift & Co. v. U. S., 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, wherein the court refused to permit local incidents of great interstate movements, which incidents taken alone are intrastate, to characterize the movement. That doctrine, he said, applies to future sales of grain, which is a part of the current of interstate commerce to the same extent as it applies to the current of stock shipments under consideration in Stafford v. Wallace. He said [page 477]:

"* * * The sales on the Chicago Board of Trade are just as indispensable to the continuity of the flow of wheat from the West to the mills and distributing points of the East and Europe, as are the Chicago sales of cattle to the flow of stock toward the feeding places and slaughter and packing houses of the East."

In United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325, the court commented that a corner consists, broadly speaking, in acquiring control of all or the dominant portion of a commodity with the purpose of artificially enhancing the price, one of the important features of which is purchase for future delivery, coupled with a withholding from sale for a limited time. The court held that a corner in the available supply of a staple commodity such as cotton, normally

a subject of trade and commerce among the states, and the consequent enhancement artificially of its price throughout the country and compelling all who have occasion to obtain it to pay the enhanced price, or else to leave their needs unsatisfied, is within the terms of Section 1, 15 U.S.C.A. § 1. There the court said [page 145]: "The corner was to be conducted on the Cotton Exchange in New York city, but by means which would enable the conspirators to obtain control of the available supply and to enhance the price to all buyers in every market of the country. This control and the enhancement of the price were features of the conspiracy upon the attainment of which it is conceded its success depended. Upon the corner becoming effective, there could be no trading in the commodity save at the will of the conspirators and at such price as their interests might prompt them to exact. And so, the conspiracy was to reach and to bring within its dominating influence the entire cotton trade of the country. * * * It well may be that running a corner tends for a time to stimulate competition; but this does not prevent it from being a forbidden restraint, for it also operates to thwart the usual operation of the laws of supply and demand, to withdraw the commodity from the normal current of trade, to enhance the price artificially, to hamper users and consumers in satisfying their needs, and to produce practically the same evils as does the suppression of competition."

█ In Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 280, 49 L.Ed. 518, 525, Justice Holmes said: "So, again, the line is distinct between this case and Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290. All that was decided there was that the local business of commission merchants was not commerce among the states, even if what the brokers were employed to sell was an object of such commerce. * * * Whether the case would have been different if the combination had resulted in exorbitant charges was left open. * * * Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another state from that of the seller and of the cattle. And we need not trouble ourselves at this time as to whether the statute could be escaped by any arrangement as to the place where the sale in point of law is consummated. See Norfolk & W. R. Co. v. Sims, 191 U.S. 441, 24 S.Ct. 151, 48 L.Ed. 254. But the 6th section of the bill charges an interference with such sales, a restraint of the parties by mutual contract, and a combination not to compete in order to monopolize. It is immaterial if the section also embraces domestic transactions." It does not follow that because such a corner as that considered by the court in United States v. Patten is local in character geographically and is a contract in restraint of trade, it is not a monopoly of a part of interstate commerce, if it places within the power of the person accomplishing it the substantial control of the market even though for a limited period and even though in one commodity, if in that commodity 90 per cent. of the commercial visible supply of the country is included. Monopoly is the acquisition of something for one's own self, not necessarily the whole of a given commodity or the whole commerce therein but control, at least, of a part thereof sufficient to constitute withholding from the public the right to deal therein in an open market. As has been said, Congress had chiefly in mind not so much the monopoly of a whole as the much more likely case of a monopoly of a smaller part. United States v. Keystone Watch Case Company, D.C., 218 F. 502. And the Supreme Court has said in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 516, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann.Cas.1912D, 734: "The commerce referred to by the words 'any part,' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce." If "any part" has both a geographical and a distributive significance, it is equally true that it may have a significance of limitation in time.

Here it is shown that Chicago is the greatest corn market of the world; that

90 per cent of the corn of the United States finds its way from all the Mississippi Valley and midwestern states into the Chicago market; that many cars of corn were shipped from Iowa in the latter part of July and became a part of the visible commercial supply in Chicago. This corn necessarily passed to the defendant in satisfaction of his contracts of purchase. When those contracts were made, when he acquired the corn that had to come from other states for future delivery, he knew that the corn would pass from the farmers to the dealers and then to the railroads into the current of interstate commerce, some of which would not find final destination in Chicago but would pass to the eastern market, but might remain in warehouses in Chicago before its final resting place in commerce was found. He knew that he was buying corn which would have to come in from the west to meet his contracts for future delivery. He immediately replaced 900,000 bushels in commerce, shipping it to Canada, thus removing it from interstate commerce into commerce with a foreign nation and taking it out of the available supply. There is substantial evidence that the acts of defendant interfered with interstate commerce and attempted to monopolize and did monopolize that part of interstate commerce represented by his contracts for future delivery in July, viz., 90 per cent of the available corn of the commercial visible supply of the entire country.

As the Supreme Court said in Board of Trade of City of Chicago v. Olsen, the fact that a corner in grain is brought about by trading in futures shows the direct relation between cash prices and actual commerce on the one hand and dealing in futures on the other, because a corner is not a monopoly of contracts only, "It is a monopoly of the actual supply of grain in commerce." And as the court said there, if a corner and the enhancement of prices produced by buying futures directly burden interstate commerce in the article whose price is enhanced, it would seem to follow that manipulations of futures which unduly increase prices of grain in interstate commerce and directly influence consignments into that commerce are equally direct. Here there was proof that the enhanced price in Chicago caused the diversion of a substantial lot of available corn in the state of Iowa and caused it to be shipped into Chicago in the latter part of July in large quantities. The proof was that this corn would normally go to other markets but, because of the tightness of the market brought about by defendant, came to Chicago. This diversion was clearly an interference with the current of interstate commerce within the contemplation of the decision in the Olsen Case. It should be observed, too, that defendant purchased 207 cars of corn on track in Chicago in July, aggregating 322,000 bushels. These were on the railroad tracks, clearly within the current of interstate commerce.

Monopolies, as such, the federal government has no control over; only when a monopoly of some part of interstate commerce is involved does jurisdiction attach to the federal government. Consequently, it must be that Congress, in speaking of monopolies of any part of interstate commerce, must have had in mind such restraints of such part of that commerce as bring about an extraordinary control of any part of the commodities in the stream of commerce. Thus the Supreme Court said in Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 516, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734:

" * * * having by the 1st section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the 2d section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the 1st section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the 1st section."

The court added: "Undoubtedly, the words 'to monopolize' and 'monopolize,' as used in the section, reach every act bringing about the prohibited results. The ambiguity, if any, is involved in determining what is intended by monopolize. But this ambiguity is readily dispelled in the light of the previous history of the law of restraint of trade to which we have referred and the indication which it gives of the practical evolution by which monopoly and the acts which produce the same result as monopoly, that is, an undue restraint of the course of trade, all came to be spoken of as, and to be indeed synonymous with, restraint of trade."

In Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, the court said [page 849]:

"* * * And combinations and conspiracies to restrain interstate commerce, or to monopolize any part of it, are none the less within the reach of the Anti-Trust Act (15 U.S.C.A. § 1 et seq.) because the conspirators seek to attain their end by any means of intrastate activities."

In Stafford v. Wallace, 258 U.S. 495, at page 518, 42 S.Ct. 397, at page 402, 66 L.Ed. 735, 23 A.L.R. 229, Mr. Chief Justice Taft said:

"'Although the combination alleged embraces restraint and monopoly of trade within a single state, its effect upon commerce among the states is not accidental, secondary, remote, or merely probable. * * * Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect of such sales.' * * * The application of the commerce clause of the Constitution in the Swift Case was the result of the natural development of interstate commerce under modern conditions. It was the inevitable recognition of the great central fact that such streams of commerce from one part of the country to another, which are ever flowing, are in their very essence the commerce among the states and with foreign nations, which historically it was one of the chief purposes of the Constitution to bring under national protection and control. This court declined to defeat this purpose in respect of such a stream and take it out of complete national regulation by a nice and technical inquiry into the non-interstate character of some of its necessary incidents and facilities, when considered alone and without reference to their association with the movement of which they were an essential but subordinate part."

In the present case the evidence indicates clearly that the only manner by which the defendant's contracts for future delivery could be performed would be by the shipment of corn into Chicago, and the proof is that no small portion of this corn that was so shipped in came from states other than Illinois. He knew that the commercial visible supply of July corn was such that his contracts could not be completed by delivery unless corn was brought from states other than Illinois into Chicago.

■ Under these decisions there was substantial proof that defendant had violated Section 2 of the Anti-Trust Act, 15 U.S. C.A. § 2.

Defendant relies upon the announcements of the Supreme Court in Ware & Leland v. Mobile County, 209 U.S. 405, 28 S.Ct. 526, 52 L.Ed. 855, 14 Ann.Cas. 1031; Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822; Albers Commission Co. v. Spencer, 205 Mo. 105, 103 S.W. 523, 11 L. R.A.,N.S., 1003; Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L.R. 1370. Ware & Leland v. Mobile County had to do with the right of a state to tax persons on transactions on a board within its jurisdiction, prior to the enactment of the Grain Futures Act. The court held that the state might legally tax such acts of commerce. In Hill v. Wallace the original Futures Trading Act was held unconstitutional. There the court held that sales for future delivery were not in themselves interstate commerce, and added that they could not come within the regulatory power of Congress unless the latter should find from evidence that they directly interfered with interstate commerce so as to be an obstruction thereto or a burden thereon. This decision should be read in connection with the Olsen Case, wherein the later act, free of the defects of the first, was held constitutional. The court, distinguishing the case of Ware & Leland v. Mobile County, supra, in United States v. Patten, said that that case presented only one question, namely, the effect upon interstate trade or commerce of the taxing by a state of the business of a broker. Moore v. New York Cotton Exchange, supra, follows closely Ware & Leland v. Mobile County, supra.

Albers Commission Co. v. Spencer, supra, was decided in 1907, many years before the decision of the Stafford and Olsen Cases by the Supreme Court of the United States; in view of the latter, the language of the Missouri Court is not deemed of controlling weight here.

Defendant denies monopoly by saying that there were hundreds of thousands of bushels of corn in the farms and granaries and in registered warehouses and that the term "visible commercial available supply" is misleading. Obviously farmers raise corn to feed stock. The testimony of Paul Mehl, Senior Economist of the Chicago Office of the Commodities Exchange Administration, was to the effect that while

the annual corn crop exceeds two billion bushels, the greater part of the crop is used by farmers and feeders; that only a relatively small percentage moves into commercial channels and that of the corn that does enter such channels, most of it is consumed by July by manufacturers of corn products. He testified that the commercial visible supply as calculated by the government includes corn in elevators and regularly authorized warehouses located in all of the twenty-four prominent grain centers of the United States. Obviously the corn on the farm is not a part of any current of interstate commerce and, when defendant had completed his acquisition of control of July futures and the time within which to deliver was rapidly expiring, it was too late for any of that corn to reach Chicago. So while the corner in corn did not cover all the commodity in the United States, it did cover that part in the current of interstate commerce represented by corn in cars in Chicago and available geographically. It was too late for any corn from any other sources to reach the Chicago market to prevent the full effectuation of the monopoly. It is on the basis of "Commercial Visible Supply" figures posted weekly that grain traders make their commitments, and with reference to which they contract.

■ The existence of corn not in commerce seems to us no defense inasmuch as defendant dominated and controlled the market of corn in commerce at the specific time complained of. Baush Machine Tool Co. v. Aluminum Co., 2 Cir., 72 F.2d 236, and United States v. New England Fish Exchange, D.C., 258 F. 732. In the latter case, the court, after commenting that Boston controlled 95 per cent. of the interstate trade of fresh ground fish, that the Fish Pier at Boston owned by the defendants, was in control of the trade and that from 70 to 80 per cent. of the fish handled were sold in interstate commerce, said [page 748]:

"The result of the combined action of the dealers was that 83 per cent. of all the fresh fish and 95 per cent. of all the ground fish brought to Boston was landed at the Fish Pier, which gave absolute control to these dealers of all the fish passing through the pier and a predominating control of all the fresh fish dealt in throughout the North Atlantic states, rendering it impossible for an outside dealer to build up a business in interstate trade.

"We think, therefore, that the defendant dealers, by combining in the manner above outlined, with a view to centralizing and controlling the flow of fish in interstate commerce and the acquisition of that control, violated the Sherman Law, and unduly and unreasonably restrained interstate trade in fresh fish."

■ It is urged by defendant that plaintiff showed no actionable damage to him and that the acts of defendant were not the proximate cause of such damage if he had any. But it is in evidence that plaintiff was compelled to settle with defendant at a greatly enhanced price and that a substantial loss ensued. The price was controlled, dictated and fixed by defendant. The situation is within the language of this court in Moore v. Backus, 7 Cir., 78 F.2d 571, 101 A.L.R. 379, where it said [page 573]:

"Accepting as true the allegations of the declaration in the legal action, it would seem that decedent suffered a property injury within the meaning of the Sherman Anti-Trust Act."

In Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, the court held that the increased price the city was compelled to pay, constituted an actionable injury, saying [page 66]:

"It was injured in its property, * * * by being led to pay more than the worth of the pipe. A person whose property is diminished by payment of money wrongfully induced is injured in his property."

In Story Parchment Company v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, Mr. Justice Sutherland, in discussing the sufficiency of the evidence to support a verdict for damages, said [page 250]:

"There was evidence from which the jury reasonably could have found that, in pursuance of the conspiracy, respondents sold their goods below the point of fair profit, and finally below the cost of production; that petitioner had an efficient plant and sales organization, and was producing a quality of paper superior to that produced by either of the three companies; and that current prices, shown in detail, were higher during a period antedating the unlawful combination and price cutting in pursuance of it than afterward. It does not necessarily follow, of course, that these

362

higher prices would have continued except for the conspiracy, but it is fair to say that the natural and probable effect of the combination and price cutting would be to destroy normal prices; and there was evidence of the prices received by petitioner before the cut prices were put into operation, and those received after, showing actual and substantial reductions, and evidence from which the probable amount of the loss could be approximated. The trial court fairly instructed the jury in substance that, if they were satisfied that the old prices were reasonable, and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts of the respondents, the jury might consider as an element of damages the difference between the prices actually received and what would have been received but for the unlawful conspiracy.

"Upon a consideration of the evidence, we are of opinion that it was open to the jury to find that the price cutting and the resulting lower prices were directly attributable to the unlawful combination; and that the assumption indulged by the court below, that respondents' acts would have been the same if they had been acting independently of one another, with the same resulting curtailment of prices, must be rejected as unsound.

"Nor can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture. This characterization of the basis for the verdict is unwarranted. * * * Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 379, 47

S.Ct. 400, 71 L.Ed. 684. Compare The Seven Brothers, D.C., 170 F. 126, 128; Pacific Steam Whaling Co. v. Packers' Ass'n, 138 Cal. 632, 638, 72 P. 161. As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."

Defendant insists that plaintiff has alleged a monopoly effective in Chicago and throughout the United States and that he must prove such an allegation; but we do not deem this essential. A monopoly in violation of the act, even though limited to Chicago or to a specific time, is still in violation of the law. The facts alleged disclose definitely that plaintiff sought to recover for damages caused by the monopoly of defendant or by his attempt to build up a monopoly and the proof is that he was in control of 97 per cent. of the commodity in Chicago, constituting 90 per cent. of the same throughout the country. We think the allegations of the complaint were such that plaintiff made a prima facie case thereunder.

Defendant also insists that the motion for directed verdict was properly allowed because plaintiff's evidence disclosed that the damages he sought to recover grew out of his illegal gambling contract. Under Section 328, Chapter 38 of the Illinois Revised Statutes, a contract for future delivery of commodities is denominated a gambling contract and void, if both parties intend at the time of making it that it shall be settled not by the delivery of the property involved but by payment only of differences in prices. The statute of Missouri, Section 4324, Missouri code, Mo. St.Ann. § 4324, p. 3006, provides that all purchases of grain without any intention to receive the same or to have the same delivered shall be deemed gambling contracts and unlawful. In view of the similarity of the statutes of the two states and of the interpretation thereof by the courts of the respective jurisdictions, no question of conflict of law arises.

In Illinois the courts have held that in order for a contract to be void as a gambling transaction, both parties must intend that it is to be settled by payment only of differences. Riordan v. McCabe, 341 Ill. 506, 173 N.E. 660. Existence or nonexistence of intention is a question of fact. Consequently in order to justify the court's direction of a verdict on the ground that the contract was illegal, we must say that the

evidence submitted, construed most favorably in behalf of plaintiff, discloses proof of a specific intent on his part not to deliver. To do this, it would be necessary for us to place ourselves in the place of the jury and to usurp its function. The plaintiff testified directly that he intended to make delivery of the corn he had sold; and that he was in position to do so and ready, willing and able to perform his undertaking in that respect. True, in the end, he settled by differences. But the evidence is such that we cannot say as a matter of law that he had the positive intent at the time he made the contract not to deliver. The question was one of fact for the jury. It might disbelieve the direct testimony of plaintiff as to his intention and ability; it had the right to consider also all other evidence bearing upon his intention, including the nature of the final settlement, plaintiff's facilities for dealing in commodities, his financial ability and all other relevant circumstances bearing in any wise upon the existence or non-existence of that intangible thing, intention. There having been substantial evidence of an intent to deliver offered by plaintiff, the trial court was without right to direct a verdict upon the ground that the contracts were gambles.

The judgment is reversed and the cause remanded with costs to plaintiff and with directions to proceed in accord with the views herein expressed.