Fletcher, Appellee, v. Coney Island, Inc., Appellant.*

(No. 7973—Decided April 4, 1955.)

*Mr. Walter S. Houston, Mr. Michael M. Turpeau, Mr. Webster W. Posey* and *Mr. Joseph H. Johnson,* for appellee.
*Messrs. Rendigs, Fry* and *Kiely,* for appellant.

Matthews, J.   This is an appeal by the defendant from a judgment of the Court of Common Pleas (see 69 Ohio Law Abs., 264, 121 N. E. (2d), 574), enjoining it at all times when the Coney Island Park and its facilities are open to the public generally, from denying to the plaintiff admission to the park and the opportunity to fully enjoy its facilities because of her race or color, or because of her membership in the National Association for the Advancement of Colored People or in the Cincinnati Council on Human Relations, or for any other reason not applicable alike to every citizen.

The appeal, which originally was on both questions of law

—————
*Judgment affirmed, 165 Ohio St., 150.

and fact, was reduced to one on questions of law only by the appellant and is now presented to this court upon the record made in the trial court.

In her petition, the plaintiff alleges that she is a Negro, a citizen of the United States and the state of Ohio and a resident of the city of Cincinnati; that the defendant is a corporation for profit organized and existing under the laws of the state of Ohio and at all times referred to in her petition was the owner and operator of Coney Island, a place of public accommodation and amusement in Hamilton County, Ohio; that on July 2, and July 4, 1953, the defendant, acting through its duly authorized agents, refused to admit her to Coney Island and denied to her the full enjoyment of the accommodations, advantages, facilities and privileges of Coney Island; and that this denial was in violation of Section 12940 of the General Code (Section 2901.35, Revised Code), in that it was based on reasons not applicable alike to all citizens and because of her race and color and notwithstanding that she had tendered payment of the admission price to the defendant's agent in charge of receiving or collecting the admission price.

The plaintiff also alleges that the conduct of the defendant constituted a denial to her of her rights as a citizen under the laws of Ohio, and, that as a result, she had suffered embarrassment and humiliation and had incurred expense in endeavoring to exercise the rights denied to her by the defendant.

The plaintiff further alleges that unless enjoined the defendant will continue to violate Sections 12940 and 12941, General Code (Section 2901.35, Revised Code), for which she would suffer irreparable damage and for which she has no adequate remedy at law.

The petition closes with a prayer for a temporary and permanent injunction restraining the defendant, its agents, employees and those under contractual relations with it, from denying to her admission to Coney Island and the full enjoyment of the accommodations, facilities, advantages and privileges thereof, because of her race or color, or for any other reason not applicable alike to all citizens.

After the court had overruled a demurrer to this petition, the defendant filed an amended answer in which, after admit-

ting its corporate capacity, it denies that on July 2, and July 4, 1953, it operated a place of public accommodation and amusement, and, by way of explanation of its denial, sets forth that on July 2 it was under contract with Second-Third Ward Civic and Social Club and on July 4 to the Guiding Star Lodge, Knights of Pythias, No. 45, giving to them the exclusive right to designate the persons who might or might not be admitted to Coney Island on those dates.

By way of further explanation, the defendant alleges that it received instructions from the aforesaid organizations to refuse admission to members of the N. A. A. C. P. or the C. C. H. R.; that the exclusion was based upon and because of previous unprovoked, unlawful, disorderly, and subversive conduct of the members of those groups at the approach to Coney Island, which conduct was detrimental to the peace and safety of the members and guests of the organizations using the park and to the citizens of the state of Ohio and of the United States; and that members of the N. A. A. C. P. and C. C. H. R. and those acting in concert with them were undesirable at the picnics scheduled by the organizations enjoying the park facilities.

The defendant alleges that the ground of exclusion was applicable to all, regardless of race or color or any consideration not equally applicable to all, and that white as well as colored members of those organizations were excluded without discrimination.

A reply was filed, placing all the allegations inconsistent with the allegations in the petition in issue.

At the conclusion of the trial, the court granted the injunction, as already noted. The judgment is based on a general finding, but the opinion of the trial judge was filed as an original paper, and we are aided in our review of this record by recourse to it, from which we are informed of the reasoning upon which the conclusion was based.

The evidence shows that the plaintiff sought admittance to Coney Island on only two occasions, that is, on July 2, and July 4, 1953, and that on each occasion she was denied admittance on, at least, the ostensible ground that she was a member of or associated with members of the N. A. A. C. P. or the C. C. H. R., one or both, and that on previous occasions members of

those organizations had committed unlawful and disorderly acts. There was other evidence tending to prove that the defendant habitually excluded Negroes, and that the plaintiff's exclusion was in fact in accordance with that practice and for no other reason.

The trial court found that the discrimination was because of the plaintiff's race and color and not for reasons applicable to all.

We cannot say that the trial court's finding in that regard is manifestly against the weight of the evidence.

The trial court found also that the defendant was in control of and responsible for the operation of Coney Island on July 2, and 4, 1953, and chargeable with the acts of those who excluded the plaintiff.

We cannot say this conclusion is manifestly against the weight of the evidence.

The plaintiff had never been a patron of or applied for admittance to Coney Island prior to July 2, 1953. Although she prays for an injunction restraining the defendant from excluding her, neither in her pleading nor in her testimony did she indicate an intention to return to Coney Island as a patron.

The defendant admitted that it would refuse to admit the plaintiff to Coney Island and the enjoyment of its facilities in the future for the reasons assigned for exclusion on July 2, and 4, 1953.

There is no evidence of any prior conviction of the defendant for violating Sections 12940 and 12941, General Code (Section 2901.35, Revised Code), or that the defendant would refuse to obey an authoritative mandate of the criminal law. However, the trial court has found that the defendant's conduct on July 2, and July 4, 1953, violated the penal provisions of Sections 12940 and 12941, General Code, and we are of the opinion that this court would not be justified in disturbing this finding or any other finding of fact.

We, therefore, have before us for review a case in which it appears that the defendant, a private corporation, on two previous occasions denied the plaintiff, because of her race and color, admittance to Coney Island, a place of public entertainment; that no attempt has been made to enforce the provisions

of Sections 12940 and 12941, General Code, by criminal prosecution, or by an action to recover the penalty; and no evidence that the plaintiff contemplated returning to Coney Island as a patron in the future.

The question is, whether under these circumstances the plaintiff is entitled to an injunction requiring the defendant to hold itself in readiness to admit the plaintiff to its park without any discrimination at any and all times she may choose to avail herself of its facilities? Plaintiff's counsel point to their client's undoubted right and assert it is the kind that should be enforced by writ of injunction. On the other hand, defendant's counsel contend that it is the kind of personal right which equity never attempted to enforce, and, furthermore, in this instance, the assumption of equity jurisdiction is excluded by the terms of Sections 12940 and 12941, General Code, which are penal statutes.

We quote Sections 12940 and 12941, General Code (Section 2901.35, Revised Code), in full:

"Whoever, being the proprietor or his employee, keeper or manager of an inn, restaurant, eating house, barber shop, public conveyance by air, land, or water, theater, store or other place for the sale of merchandise, or any other place of public accommodation or amusement, denies to a citizen, except for reasons applicable alike to all citizens and regardless of color or race, the full enjoyment of the accommodations, advantages, facilities or privileges thereof, or, being a person who aids or incites the denial thereof, shall be fined not less than fifty dollars nor more than five hundred dollars or imprisoned not less than thirty days nor more than ninety days, or both."

"Whoever violates the next preceding section shall also pay not less than fifty dollars nor more than five hundred dollars to the person aggrieved thereby to be recovered in any court of competent jurisdiction in the county where such offense was committed."

Lawyers and courts have long been accustomed to declare as uncontrovertible maxims of equity that an injunction would never issue to restrain the commission of crimes and that equity was concerned with property rights and would not grant an injunction to restrain the violation of personal rights. It

was said that these limitations were self-imposed, and that they were a part of the equity jurisprudence that was transplanted from England to this country.

In more recent years the validity of these limitations has been challenged, and the assertion made that they rested upon dicta and were not well-established limitations upon the power of the Chancellor.

However that may be, there is no doubt that they represent the reluctance of courts of equity to award its injunctive process to enforce purely personal rights having no relation or resemblance to property rights. Most courts have been preoccupied with demonstrating that a property right existed, rather than with an attempt to justify a disregard of the rule, and their statements that equity would enforce personal rights by the writ of injunction have themselves been largely obiter dicta. And while courts are now inclined to give a liberal interpretation to property rights where its process could effectively enforce them, still it is recognized, we think generally, that certain personal rights are unenforceable by any court. In *Kenyon* v. *City of Chicopee*, 320 Mass., 528, 70 N. E. (2d), 241, 175 A. L. R., 430, it is said at page 534:

"Doubtless there are personal rights of such delicate and intimate character that direct enforcement of them by any process of the court should never be attempted."

Both state and national governments have had experience in attempts to do too much, resulting in inability to do anything. Equity has at all times been on guard so as not to be misled into attempting that beyond its power.

Modern objections to an extension of equity jurisdiction in this field are summarized in 43 Corpus Juris Secundum, 762, Section 150, in this language:

"The objections to 'criminal equity' are that it deprives defendant of his jury trial; that it deprives him of the protection of the higher burden of proof required in criminal prosecutions; that, after imprisonment and fine for violation of an equity injunction, defendant may be subjected under the criminal law to punishment for the same acts; that it substitutes for the definite penalties fixed by the Legislature whatever punishment for contempt a particular judge may see fit to exact; that

it is often no more than an attempt to overcome by circumvention the supposed shortcomings of jurors; and that it may result, or induce the public to believe that it results, in the arbitrary exercise of power and in government by injunction. The possibility that many persons will violate the law and that many suits will be required to enforce it, the mere fact that the officers charged with the duty of enforcing the provisions of the criminal law neglect or refuse to perform their duty in this regard, the failure of local jurors to convict, or the fact that the punishment for the crime is inadequate does not warrant relief by injunction.''

Let us analyze the cases chiefly relied upon by the plaintiff. The principal one seems to be *Kenyon* v. *City of Chicopee, supra.* The dissimilarity is striking. *Kenyon* v. *City of Chicopee* is not a case in which equity awarded its injunctive process as an aid to enforce a criminal statute. The purpose of that injunction was to prevent the enforcement of a municipal penal ordinance. Nor did the plaintiff seek an injunction to enforce a new legal right created by a statute which also provided a remedy. The plaintiffs—Jehovah's Witnesses—sought and secured an injunction, preventing the public officers from arresting them while they were exercising their constitutional right to peaceably distribute religious tracts and handbills on the public streets. The action was commenced after the defendants had repeatedly arrested and convicted the plaintiffs of distributing their literature on the public streets in violation of the municipal ordinance, as it was interpreted by them.

The court referred to the possibility of the right to advertise by handbills in the street being called ''by some stretch'' a property right, and then refused to consider whether such a property right was invaded and placed its decision squarely upon the basis that under certain circumstances, and specifically the circumstances in that case, equity would grant an injunction to protect a personal right. The circumstances under which an injunction would be, and was granted are stated by the court at page 534:

''We believe the true rule to be that equity will protect personal rights by injunction upon the same conditions upon which it will protect property rights by injunction. In general, these

conditions are, that unless relief is granted a substantial right of the plaintiff will be impaired to a material degree; that the remedy at law is inadequate; and that injunctive relief can be applied with practical success and without imposing an impossible burden on the court or bringing its processes into disrepute.''

Later the court saw fit to state that the defendants had stated that they had no intention of defying the court.

It will be observed that in *Kenyon* v. *City of Chicopee, supra,* it was official action that was enjoined and that it was the constitutional rights of freedom of speech and freedom of religion that were protected thereby. It enforced a policy already determined by the Bill of Rights. It made no attempt to originate a policy of government. And the action enjoined was action by agents of the state.

It is manifest that *Kenyon* v. *City of Chicopee, supra,* did not involve the question of equity supplementing by injunction the penalties provided in a criminal statute.

The plaintiff would be justified in relying upon *Orloff* v. *Los Angeles Turf Club, Inc.,* 30 Cal. (2d), 110, 180 P. (2d), 321, 171 A. L. R., 913, were this litigation in a California court. That case does decide that under the law of that state the provision of a penalty and compensatory damages for violating its civil rights statute does not exclude the granting of injunctive relief; nor does the absence of a property right exclude such relief. It is weakened as a precedent to guide us in this case because of several statutes that influenced the California court. That court called attention to California's statutes requiring a liberal construction of statutes, and another statute expressly extending equity jurisdiction to protecting personal rights by injunction. Another distinction is found in the civil rights statute itself. Unlike the Ohio statute, there is no provision for a choice of remedies between a prosecution for a misdemeanor and a civil action to recover damages not exceeding $500.

There are no comparable statutes in Ohio to expand the meaning of Section 12940 *et seq.,* General Code (Section 2901.35, Revised Code), or to render inappropriate the application of the customary rules of statutory construction.

As has been made clear by the recent decisions of the Su-

preme Court of the United States (*Shelley* v. *Kraemer,* 334 U. S., 1, 92 L. Ed., 1161, 68 S. Ct., 836, 3 A. L. R. (2d), 441; *Hurd* v. *Hodge,* 334 U. S., 24, 92 L. Ed., 1187, 68 S. Ct., 847) the Fourteenth Amendment to the Constitution of the United States deprives both the United States government and also all state governments of all power to discriminate among their citizens because of race or color or previous condition of servitude. The Amendment per se took away all power of classification on any such basis and enforced complete neutrality, and withdrew from government the power to assist in any way in any such discrimination. To that extent only was the amendment self-executing. In the absence of enabling legislation, no governmental agency was empowered to affirmatively enforce the constitutional mandates of equal rights.

After the ratification of the Fourteenth Amendment, Congress, without much delay, passed an enabling act, making it a misdemeanor for any person to deny any citizen, except for reasons by law applicable to citizens of every race and color and regardless of any previous condition of servitude, the full enjoyment of any of the accommodations, advantages, facilities or privileges of inns, public conveyances, theatres, and other places of public amusement punishable by fine of not less than $500 nor more than $1,000, or imprisonment of from 30 days to one year, or both, and subject to a penalty of $500, payable to the aggrieved party. This act of Congress was made applicable directly to all persons regardless of their situation or activity at the time. In the *Civil Rights Cases,* 109 U. S., 3, 27 L. Ed., 835, 3 S. Ct., 18, decided October 15, 1883, the Supreme Court was called upon to decide whether either the Thirteenth or Fourteenth Amendments to the Constitution of the United States conferred upon Congress the power to enact such a law to control intrastate activities. The charges against two defendants were that they had excluded a certain person from the dress circle in a theatre in San Francisco because of race or color; another was charged with denying the privileges of a theatre in New York to a person on account of race or color; another was a railroad company charged with denying to a certain woman the right to ride in the ladies' car because of her race or color. The Supreme Court held that the legislation was

beyond the power of Congress. Its decision is summarized in the second paragraph of the syllabus, which we quote:

"The XIVth Amendment is prohibitory upon the states only, and the legislation authorized to be adopted by Congress for enforcing it is not *direct* legislation on the matters respecting which the states are prohibited from making or enforcing certain laws, or doing certain acts, but is *corrective* legislation, such as may be necessary or proper for counteracting and redressing the effect of such laws or acts."

It was not until after the Supreme Court of the United States had decided the *Civil Rights Cases* that Ohio saw fit to legislate on this subject. Up until that time it had left the relation of common carriers, theatre owners, inns, and places of amusement, and their patrons, unregulated and in the realm of "Free Choice" so far as discrimination because of race or color was concerned. But immediately after the *Civil Rights Cases* decision the Ohio Legislature enacted its first so-called "Civil Rights" statute. By the Act of February 7, 1884, the Legislature declared that all persons within the jurisdiction of the state of Ohio should be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances on land and water, theatres and other places of public amusement, subject only to the conditions and limitations established by law and applicable alike to citizens of every race and color. 81 Ohio Laws, 15. By Section 2 of the Act it was provided:

"That any person who shall violate any of the provisions of the foregoing section by denying to any citizen, except for reasons applicable alike to all citizens of every race and color, and regardless of color or race, the full enjoyment of any of the accommodations, advantages, facilities, or privileges in said section enumerated, or by aiding or inciting such denial, shall, for every such offense, forfeit and pay a sum not to exceed one hundred dollars to the person aggrieved thereby, to be recovered in any court of competent jurisdiction, in the county where said offense was committed; and shall also, for every such offense, be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not to exceed one hundred dollars ($100), or shall be imprisoned not more than thirty days, or both; and

provided, further, that a judgment in favor of the party aggrieved, or punishment upon an indictment, shall be a bar to either prosecution respectively.''

Ten years later the act was amended by providing that the person aggrieved could recover not less than $50 and not more than $500 and upon conviction, the accused should be fined not less than $50 nor more than $500, and imprisoned not less than 30 days nor more than 90 days, or both. 91 Ohio Laws, 17.

These provisions are now found in the Revised Code as Sections 2901.35 and 2901.36. The only substantial change that has been made since the original enactment has been in the amount of the penalty. The provision making a judgment in favor of the aggrieved person or the punishment of the offender a bar to further prosecution has remained substantially the same.

With the passage of this law in 1884, Ohio, for the first time, declared the right of all citizens to equal treatment in inns, public theatres, places of public amusement, and public conveyances, and placed the sovereign power of the state behind the enforcement of such rights. Theretofore, the state was required to refrain from any discrimination itself or from assisting any private person in making any such discrimination, but until the passage of this act whether there should be discrimination or nondiscrimination fell outside the domain of positive law. It remained in that field of ''free choice,'' in which the operator was free to deny access to his facilities, and the prospective patron was free to withhold his patronage. This right of free choice determines the domain of liberty for every American citizen of every race and color.

What we have just said is for the purpose of emphasizing that the legal right asserted by the plaintiff in this case is one founded on Section 12940 *et seq.*, General Code (Section 2901.35 *et seq.*, Revised Code). In other words, it is a statutory right, the method of enforcing which was set forth in the statute creating the right and as a part of the right itself.

We have been cited to no case—and our own research has found none—in which a court of equity in an action between private persons has granted an injunction to prevent the violation of such a right in the absence of some statute enlarging

equitable jurisdiction, excepting the case of *Gillespie* v. *Lake Shore Golf Club,* 56 Ohio Law Abs., 222, 91 N. E. (2d), 290, in which it was assumed, without discussion, that as it had been found that the Ohio Civil Rights Statute had been violated an injunction should issue. None of the cases cited in support of the text in 9 Ohio Jurisprudence (2d), 305, Section 20, involved this question. The only authority discussing the subject and supporting the textual statement that an injunction would issue is that of *Colbert* v. *Coney Island, Inc.,* 97 Ohio App., 311, 121 N. E. (2d), 911, and it is conceded that the only question involved or decided by it was whether a class action could be maintained. It was held that it could not, and what was said by the court was an aside remark in discussing the case of *Kenyon* v. *City of Chicopee, supra,* which as we have heretofore demonstrated, we believe, does not fall in the same class as the case at bar.

The jurisdiction of the Court of Common Pleas is fixed by the Legislature under the authority conferred upon it by the Constitution of Ohio. The Legislature has conferred jurisdiction upon it generally in all civil actions, whether they had theretofore been denominated actions at common law or suits in equity. It has not enlarged by direct statutory enactment or by implication the equitable power of the court to protect personal rights, such as are asserted in this case, through the issuance of a writ of injunction. If such a power is to be exercised, the authority for so doing must be found to have existed from the beginning and that it should be exercised in spite of the difficulties of enforcement. We are not convinced that such a right as is here asserted forms a proper foundation for invoking the equitable powers of the court. However, we do not base our conclusion entirely upon this premise, because we are convinced that the Legislature has so connected this statutory right with the remedy as to preclude resort to any other remedy. That the sovereign in creating a right can determine the extent to which it will go in the enforcement of the right will not be disputed. Whether the right should be enforced at all was a pure matter of policy. The extent of enforcement rested in the discretion of the Legislature.

In granting this legal right against operators of places of

amusement, the Legislature provided that whoever violated the right should be fined or imprisoned, or both, should pay not less than $50 nor more than $500 to the person aggrieved, and that "Either a judgment in favor of the person aggrieved, or the punishment of the offender upon an indictment * * * shall be a bar to further prosecution for a violation of such sections."

It will be observed that the aggrieved person is offered an alternative—a choice. He can pursue one, but not both. If he pursues either to judgment or punishment, he is barred from the other.

Surely, if the Legislature had intended to give the aggrieved person a third remedy, it would have said so in unmistakeable language, particularly if it had been its intention to give him a remedy enforceable by proceedings in contempt without any limitation, when it so carefully provided that he must choose between the express statutory remedies provided, neither of which was so drastic as the unmentioned remedy of injunction.

That the Legislature could have provided for the enforcement of this law by injunction is not doubted. In many instances it has expressly provided for the enforcement of its policy by means of injunction, but in such instances it has done so by express provision. Enjoining monopolies is an outstanding instance. It would seem that had the Legislature intended recourse to this remedy, it would have expressly so provided.

We believe this statute clearly calls for the application of the ordinary rules of statutory construction.

In 37 Ohio Jurisprudence, 792, Section 466, it is stated that "where a statute creates a new right or imposes a new duty, and prescribes a remedy for its violation, the remedy thus prescribed is exclusive."

This rule was applied in the early case of *Shepard* v. *Commissioners of Darke County,* 8 Ohio St., 354. This case was followed in *Commissioners* v. *Bank of Findley,* 32 Ohio St., 194, and many others. *Commissioners* v. *Bank of Findley* has also been cited with approval and followed in many cases. It was expressly referred to and incorporated in the text of Endlich On The Interpretation of Statutes.

This court had recourse to this rule of statutory construc-

tion in the recent case of *General Electric Co.* v. *International Union, I. U. U. A. & A. I. W. of America,* 93 Ohio App., 139, 149, 108 N. E. (2d), 211. We found the text supported by many cases.

*G. H. Albers Commission Co.* v. *Spencer,* 205 Mo., 105, 103 S. W., 523, 11 L. R. A. (N. S.), 1003, seems directly applicable on this phase of this case. The second L. R. A. headnote adequately indicates the position of the court on this subject:

"Equity will not enjoin enforcement of a contract because of conduct on the part of defendant which violates a statute denouncing trusts and combinations, where the remedy provided by the statute for one injured by its violation is a suit for damages."

However, it is suggested that before the statutory remedy can be declared exclusive, there must be a determination that it is adequate. By what standard its adequacy can be determined has not been disclosed. Where a right has been created by legislative enactment, and no such right exists except by virtue of such enactment, it is impossible to measure the right except by the extent to which the Legislature has indicated the willingness of the sovereign to assist in enforcing the right. Had no law been enacted, the plaintiff would have had no remedy, and, therefore, no right. Extending the aid of the sovereign in a specific respect certainly does not indicate an intent to assist in all conceivable respects. The law-making body—the policy-making body and the body that created the right—furnished the measure of the legal right by the remedy provided for its enforcement.

Reverting to the case of *Orloff* v. *Los Angeles Turf Club, Inc., supra,* the court sought to bolster its construction of the California statute by a reference to the possibility of the existence of a rule requiring that the remedy should be adequate before it could be held to be exclusive. At page 113, the court said:

"A factor of importance in interpreting the statute and in applying the above mentioned rule of statutory construction is the adequacy of the remedy provided by the statute. It has been intimated in regard to the rule of statutory interpretation here

discussed, that it should not apply when the remedy provided by statute is inadequate. (See *Lynch* v. *Butte County,* 102 Cal., 446 [36 P., 806]; *Steves* v. *Robie,* 139 Me., 359 [31 A. (2d), 797]; *Ohio Valley Fire & Marine Ins. Co.* v. *Wash,* 205 Ky., 819 [266 S. W., 921]; *Grimes* v. *Central Life Ins. Co.,* 172 Ky., 18 [188 S. W., 901]; *Hickman* v. *City of Kansas,* 120 Mo., 110 [25 S. W., 225, 226, 41 Am. St. Rep., 684, 23 L. R. A., 658].)''

It will be observed that the court very guardedly referred to the pronouncements of the courts on this subject as an intimation, which, as we understand, means a mere hint, certainly not a decision. An examination of the cases discloses that in every case excepting one, the court held that the statutory remedy was exclusive. Not one decided that the statutory remedy was inadequate and that, therefore, the remedy was cumulative and not exclusive. This, without doubt, accounts for the court's language.

The one case that held the statutory provision nonexclusive is the case of *Hickman* v. *City of Kansas,* 120 Mo., 110, 25 S. W., 225, 23 L. R. A., 658, 41 Am. St. Rep., 684. It was an action to recover damages to plaintiff's property caused by a change of grade. It was claimed that as a certain statute expressly provided an exclusive remedy, it precluded recourse to an ordinary action for damages for the taking. That the statute provided no remedy at all for the property owner is made manifest by the second L. R. A. headnote:

''A statutory remedy for a constitutional right to damages in a condemnation case cannot be made exclusive, where the owner of the property is given no power to initiate such proceeding or to enforce payment after the damages are assessed.''

It is clear that that case did not involve a statute creating a new right and providing a remedy for its enforcement. It involved a statute which attempted to expressly limit the remedy for the enforcement of a right existing independently of the statute to a proceeding that the property owner had no power to initiate.

The court in the *Orloff* case also referred to certain articles in the Harvard Law Review, the California Law Review, and the Illinois Law Review. A reading of these articles dis-

274

closes that the authors concede that the overwhelming weight of the authorities denies the jurisdiction of equity to grant an injunction to enforce personal rights of this character.

We are asked in this case to assume a jurisdiction which the English Court of Chancery refused to exercise until Parliament had authorized it to do so. There is no Ohio legislation conferring such jurisdiction upon the Court of Common Pleas. To grant the relief would, in our opinion, constitute a usurpation of the policy-making power of the Legislature.

Upon the whole case, we are of the opinion that the right here asserted is, in its very nature, one falling outside the jurisdiction and power of a court of equity, and, furthermore, that the statute creating it provides the exclusive remedy for its enforcement.

For these reasons, the judgment is reversed and final judgment entered in this court for the defendant.

*Judgment reversed.*

Ross, P. J., and HILDEBRANT, J., concur.